STATE of Wisconsin, Plaintiff-Respondent,

v.

BRUCE E. BLACK, Defendant-Appellant.†

Court of Appeals

*Nos. 99–1686–CR, 99–1687–CR, 99–1688–CR, 99–1689–CR.*
*Submitted on briefs March 28, 2000.—Decided July 12, 2000.*

## 2000 WI App 175

(Also reported in 617 N.W.2d 210.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William E. Schmaal*, assistant state public defender, of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Stephen W. Kleinmaier*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. SNYDER, J. This case presents the following issue: When a person provides oral identification to a police officer conducting a *Terry*[1] stop and requesting identification, may the officer perform a limited search for identifying papers when the information provided is not confirmed by police records? We conclude that under *State v. Flynn*, 92 Wis. 2d 427, 285 N.W.2d 710 (1979), an officer may perform such a search given the present circumstances. The frisk for identification here was limited to a wallet or other repository for identifying papers. The intrusion upon the suspect was minimal and, we are persuaded, outweighed by the officer's observation of the suspect's bulging pockets and the officer's experience with persons who claim not to carry identification when in fact they do. We affirm the circuit court's judgments.[2]

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

[2] This appeal is a consolidation of four unrelated cases. The substance of Bruce E. Black's appellate argument relates only to No. 99–1686–CR involving his conviction for possession of cocaine with intent to deliver contrary to WIS. STAT. § 961.41(1m)(cm)1 (1995–96) and obstructing an officer contrary to WIS. STAT. § 946.41(1) (1995–96). (All references to the Wisconsin Statutes are to the 1995–96 version.) Black, however, requests that we vacate his guilty pleas and convictions pertaining to No. 99–1687–CR (escape from custody contrary to WIS. STAT. § 946.42(3)(a)), No. 99–1688–CR (delivery of LSD as a repeater contrary to WIS. STAT. §§ 961.41(1)(f)1 and 939.62) and No. 99–1689–CR (robbery by use of force as a party to the crime and as a repeater contrary to WIS. STAT. §§ 939.05, 943.32(1)(a) and 939.62). He contends that because his decision to enter into a joint plea agreement as to all of the cases was influenced by the court's denial of his suppression motion in No. 99–1686–CR, an appellate decision in his favor would "negate one part of an inter-connected plea bargain." We conclude, however, that

## BACKGROUND

¶ 2. The facts are undisputed. On October 3, 1997, at approximately 6:30 p.m., City of Fond du Lac Police Detectives Pat Primising and Steve Kaufman were conducting surveillance at the scene of a drug investigation when they were directed to follow a black Ford Tempo away from the area. The car eventually stopped at a tavern where several occupants exited the vehicle and conversed with tavern patrons while Bruce E. Black approached the driver's side and apparently exchanged something with the driver. The detectives were unable to see what was exchanged. At that time a uniformed bicycle patrolman, Officer Lee Mikulec, arrived at the scene, and the Tempo drove away as the bystanders and Black dispersed. The detectives did not see Black carrying anything at this time.

¶ 3. As the detectives drove off to follow the Tempo, they radioed Mikulec to have Black "checked out" for his identification. The detectives gave a physical description of Black, noting what he was wearing and that he was a "black male." The detectives then saw Black speaking with a young man whom the detectives had previously observed holding paper or money in his hand and yelling at the Tempo, after which an exchange had also occurred. The detectives suspected that Black and the occupants of the Tempo had engaged in drug transactions.

· ¶ 4. After receiving the message from the detectives, Mikulec rode his bicycle on the sidewalk alongside Black as he proceeded down the street. Mikulec identified himself and asked Black for identification. Black gave him the name "Lee Brown" and a

because his Fourth Amendment argument fails on appeal, all of his convictions must stand.

date of birth, and continued to walk southbound, indicating that he was looking for his girlfriend. Mikulec radioed dispatch to confirm the information Black had given him. Dispatch reported back that the identity provided was "not on file." Black then informed Mikulec that he was from Michigan and Mikulec attempted to confirm this information, but his name again came up "not on file." Black told Mikulec that he did not have any form of identification on his person to confirm his name and date of birth.

¶ 5. While Black and Mikulec proceeded to walk down the street, Mikulec examined Black for signs that he was carrying identification. Mikulec noticed that while there was apparently nothing in Black's back pants pockets, his front pockets were "bulging." Mikulec testified that as Black was stopped on the curb, "I took my hand and brushed it against the right side of his pants pocket and as I touched the pocket, he indicated 'change.' " Mikulec explained that he had touched Black's pocket

> to see if there was a wallet in there, because he indicated that he had no identification, and [I] had to confirm this. And based upon the bulge, it did look like there was something in there that might be a wallet. And this has happened routinely to me where people tell me they don't have identification only to find a wallet later on them and find that it's usually a way for them not to provide identification.

Mikulec further explained that he had touched the outside of the pocket with the back of his hand and tapped it, but did not reach inside the pocket. After Black replied that his pocket had change, he pulled some coins out to confirm this.

207

¶ 6. Mikulec then touched and tapped the outside of Black's left pants pocket. Mikulec testified:

> And when I touched that, I could feel what felt like a pair of hard objects, and I tapped it again and it felt like film canisters, and I made the comment to this individual that it felt like film canisters, and I made the comment to him that based upon the fact that he wasn't carrying a camera, film canisters are usually used for transporting drugs, and I asked him if he would take the contents out of his left pocket.

When Mikulec asked Black to take the objects out of his pocket, Black responded "fuck that" and fled.

¶ 7. As Mikulec pursued Black on his bicycle, Black took the containers out of his pocket and ran with them in his hand. Once Mikulec cornered Black, Black threw the containers down. Mikulec arrested Black and then found prescription medication bottles. The bottles contained cocaine.

¶ 8. Black was charged with possession of cocaine with intent to deliver and obstructing a police officer. At his suppression hearing, the circuit court found that there was reasonable suspicion for Mikulec's search, that "much of the touching was done consensually," and that Black made no objection until Mikulec felt Black's left pocket and asked him to show him the containers. The court denied Black's motion to suppress evidence. Black appeals.

## DISCUSSION

¶ 9. The sole issue raised by Black is the reasonableness of Mikulec's search for identification. In reviewing an order denying a motion to suppress evidence, we will uphold a circuit court's factual findings

unless they are against the great weight and clear preponderance of the evidence. *See State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1989). However, whether a search passes constitutional muster is a question of law subject to de novo review. *See State v. Richardson*, 156 Wis. 2d 128, 137–38, 456 N.W.2d 830 (1990).

¶ 10. The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution guarantee citizens the right to be free from "unreasonable searches and seizures." Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may stop an individual and request identification if he or she is suspected of criminal involvement. *Terry* was codified under WIS. STAT. § 968.24, which provides:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

¶ 11. The issue of conducting an identification search has been addressed by our supreme court in *Flynn*. Because this decision is dispositive, we summarize the case in detail below.

¶ 12. In *Flynn*, the police were dispatched at 2:45 a.m. to a break-in at a sporting goods store and were given a description of one suspect who had allegedly taken a rifle. A half hour later, Officer Sargent observed two men emerge from an alley two blocks from the burglarized store. One of the men fit the

description of the suspected burglar. Sargent approached the two men and requested identification. The person who fit the suspect's description properly identified himself, but the other man, Flynn, refused. Sargent explained to Flynn the reason for requesting identification—that there had been a burglary in the area and that Flynn was accompanying a man who fit the burglar's description—but Flynn persisted in his refusal. Although Flynn admitted that he was carrying identification in his wallet, he stated that under no circumstances would he show it to Sargent. Sargent informed Flynn that if he refused he would take him to the police station to identify him there. Flynn again refused and became belligerent with Sargent.

¶ 13. Sargent then conducted a frisk of Flynn and removed his wallet and a pair of pliers. As the frisk was taking place, Flynn dropped his arms and a flashlight fell from his sleeve. The pliers and flashlight were seized and the wallet was examined for identification. Once Flynn's name was found on a document in the wallet, Sargent and the other officers radioed headquarters and discovered that Flynn was wanted for a prior burglary. *See Flynn*, 92 Wis. 2d at 432. Flynn was then placed under arrest, taken to the police station and later charged with burglary.

██

¶ 14. The supreme court ruled that the identification search was constitutional.[3] In reaching its decision, the court initially observed that "unless the

---

[3] The court first found that the search and discovery of the pliers and flashlight were justified pursuant to *Terry* and WIS. STAT. § 968.25. The frisk was supported by the fact that there was a report of a burglary in the area, Flynn was in a desolate alley in the middle of the night, a firearm had been taken, and Flynn had become verbally abusive and uncooperative.

officer is entitled to at least ascertain the identity of the suspect, the right to stop him can serve no useful purpose at all." *Id.* at 442. The court stated that police authority would be diminished where an officer had the right to request identification but the suspect could simply refuse without any detriment to the suspect. *See id.* at 444.

¶ 15. In determining whether Sargent's search for identification was reasonable under the Fourth Amendment, the court conducted a balancing test in which the need for the particular search is weighed against the invasion of personal rights that the search entailed. *See id.* at 446. The court determined that the need for identification was high because the officers had reason to believe a crime had taken place in the vicinity, it was very early in the morning, there was at least one firearm that had been taken and the public has a compelling interest in the quick apprehension of burglars. On the other side of the scale, the intrusion was considered appropriate because the officer removed Flynn's wallet solely to look for identifying papers. *See id.* at 446–47. "These officers were not fishing for whatever evidence they could find, but sought merely to learn defendant's identity." *Id.* at 448. The court thus concluded that when a person refuses to provide identification when an officer is justified in stopping him or her and requesting identification, the officer may remove his or her wallet to obtain the identification.

¶ 16. In permitting an identification search, the *Flynn* court was careful to limit its holding to "factual situations such as the one presently before us." *Id.* at 449. Professor Wayne R. LaFave has commented that

[a]s in *Flynn*, [an identification] search should be permitted *only* if the suspect was first afforded ample opportunity to supply the necessary identification. Under *no* circumstances should a wholesale search of the person (e.g., for letters) be permitted even when such a search might uncover some information bearing upon the suspect's identity. Rather, such searches should be limited *only* to wallets or similar common repositories of identification papers, and examination of such containers should be allowed *only* to the extent necessary to find a driver's license or similar document. And if the precise location of the wallet or like container is not known, *only* a frisk should be allowed as a means of discovering it.

4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.5(g) 306–07 (1996).

■

¶ 17. We are persuaded that Mikulec's limited search for identification in this case was permissible under *Flynn*. In conducting a Fourth Amendment "reasonableness" balancing test, we begin with Mikulec's justification for initiating the search. *See Flynn*, 92 Wis. 2d at 445. Mikulec was instructed by Officers Primising and Kaufman to obtain identification from Black. No other details were provided.[4] When the

---

[4] The State would have us attribute the collective knowledge of Primising and Kaufman to Mikulec in support of his identification search. We disagree with this approach because the cases upon which the State relies are not on point. For instance, in *Schaffer v. State*, 75 Wis. 2d 673, 250 N.W.2d 326 (1977), *overruled on other grounds by State v. Walker*, 154 Wis. 2d 158, 185–86, 453 N.W.2d 127 (1990), the court held that the arresting officer, who had not personally acquired factual information to establish probable cause, could rely on all "collective information in the police department, and, acting in good faith

information Black provided Mikulec came up as being "not on file," it was reasonable for Mikulec to be dissatisfied with Black's response and to want to investigate further. As the *Flynn* court observed, "unless the officer is entitled to at least ascertain the identity of the suspect, the right to stop him can serve no useful purpose at all." *Id.* at 442. When Mikulec noticed Black's bulging pockets, he had reason to suspect that Black was carrying identification. In conducting a limited search for identification, Mikulec acted on his experience that persons sometimes deny carrying identification when in fact they have identifying papers.

¶ 18. As to the nature of the intrusion, Mikulec's search was slight. Mikulec touched and tapped Black's pockets in order to determine whether Black was carrying a wallet or other repository for identification. As Mikulec felt Black's pockets, he noticed that Black was

---

on the basis of such information, may assume at the time of apprehension that probable cause has been established." *Id.* at 676. Similarly, the court in *Desjarlais v. State*, 73 Wis. 2d 480, 491, 243 N.W.2d 453 (1976), stated that where there is a "police-channel communication" to an arresting officer who acts in good faith on the information, the arrest is valid if probable cause is demonstrated by the facts held by the department "which were summarized in police dispatches." In both of these cases, the collective police information was communicated to the arresting officer prior to the arrest. In the present case, the information was not given to the officer. We therefore conclude that in order for the collective-information rule to apply, such information must actually be passed to the officer before he or she makes an arrest or conducts a search. This conclusion is supported by *State v. Friday*, 140 Wis. 2d 701, 712–15, 412 N.W.2d 540 (Ct. App. 1987), *reversed on other grounds*, 147 Wis. 2d 359, 371–79, 434 N.W.2d 85 (1989), where we held that collective police data cannot support an officer's search when the data is not in fact communicated to the officer prior to the time the search is made.

carrying hard canisters. Upon inquiring about the objects, Black bolted. Professor LaFave has cautioned that an identification search should be strictly limited to uncovering a wallet or similar repository for identification papers. *See* 4 LaFave at § 9.5(g) 307. Here, Mikulec's search was focused on obtaining Black's identification until Mikulec felt the canisters.[5] Mikulec's search did not go to the extent that Officer Sargent's did in *Flynn*. Mikulec did not reach inside Black's pockets for his wallet; he merely felt the outside for something that could contain identification. Mikulec's conduct was consistent with LaFave's suggestion that if the precise location of the wallet is unknown, "*only* a frisk should be allowed as a means of discovering it." 4 LaFave at § 9.5(g) 307.

¶ 19. The facts in this case present a close question of the reasonableness of Mikulec's search. While the justification for obtaining Black's identity does not provide the same compelling reasons as in *Flynn*, Mikulec's search was also much more limited than Sargent's. Because our supreme court has placed an emphasis on the need to ascertain a suspect's identity, we conclude that Mikulec's search was reasonable. If we were to conclude otherwise, then police would be unable to positively establish a suspect's identity when the suspect provides false or unconfirmed information. As the *Flynn* court cautioned, if an officer does not obtain the person's name, "the officer must either attempt to follow the suspect in the hope that he will discover some clue as to his identity, or surrender the potential lead and continue his investigation along other lines. Particularly where the officer is confronted

---

[5] We note that Black does not object to Mikulec's inquiry into the nature of the containers.

with a number of potential suspects, limiting his options in this manner could have a perplexing effect on law enforcement efforts." *Flynn*, 92 Wis. 2d at 442.

¶ 20. We affirm the circuit court's decision denying Black's motion to suppress.

*By the Court.*—Judgments affirmed.